**Mark MUNNS, et al., Plaintiffs,**

v.

**Hillary Diane Rodham CLINTON, et al., Defendants.**

**No. 2:10–cv–00681–MCE–EFB.**

United States District Court, E.D. California.

Sept. 29, 2011.

---

William Wayne Palmer, Law Office of William W. Palmer, Sacramento, CA, for Plaintiffs.

Zachary Carl Richter, Govt., Siegmund Fred Fuchs, Govt., U.S. Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

MORRISON C. ENGLAND, JR., District Judge.

Plaintiffs Mark Munns and Christa Munns (acting as administrators of the estate of Joshua Munns), Dennis DeBrabander and Sharon DeBrabander (acting as administrators of the estate of John Young), and Lori Silveri (acting as administrator of the estate of John Cote) (collectively "Plaintiffs") initiated this action against Defendants Hillary Diane Rodham Clinton, individually and in her official capacity as United States Secretary of State (hereafter "Clinton" or "Secretary"), and Jennifer Foo, individually and in her official capacity as an employee of the Office of the Secretary of State (hereafter "Foo"), (collectively "Defendants") alleging causes of action arising out of the deaths of Josh-

ua Munns, John Young and John Cote ("Decedents"). Presently before the Court are Defendants' Motions to Dismiss (ECF Nos. 19 and 21) all of Plaintiffs' claims against them in both their individual and official capacities. Also before the Court are an Objection and Motion to Strike Defendants' Motions to Dismiss (ECF No. 37) and a Request for Judicial Notice (ECF No. 38) filed by Plaintiffs. Defendants' Motions came on for hearing before the Court on June 23, 2011, at 2:00 p.m. For the following reasons, Defendants' Motions are GRANTED with leave to amend. Plaintiffs' Objection and Motion to Strike and Request for Judicial Notice are DENIED.

## BACKGROUND [1]

Plaintiffs are the families of three men, Joshua Munns, John Young and John Cote, who were killed in Iraq in 2008 ("Decedents"). Decedents were employed by a private contractor, Crescent Security ("Crescent"), that performed security functions under contract with the United States Government.[2] The events underlying the Complaint were triggered when Crescent assigned Decedents and four other men to guard a one and one-half mile long military convoy traveling from Kuwait to Southern Iraq.

According to Plaintiffs, Crescent issued the men substandard equipment, ordered another security team that was supposed to assist in the duty to stand down, and failed to provide the men proper instructions or job guidelines. In addition, Iraqi security team members, who were also Crescent employees, failed to appear for the assignment, leaving only the seven men to guard the convoy.

While under Decedents' guard, the convoy stopped at an Iraqi checkpoint. After three to five minutes of waiting, a white pickup truck approached and shot at the rear vehicle, which was not occupied by any of the Decedents. Decedents themselves, however, were also stopped by Iraqi men in police uniforms. They were stripped of their communications gear and weapons, bound and forced into the backs of different vehicles. Plaintiffs allege one of the Iraqi officers was a former Crescent employee and that Crescent's Iraqi interpreter was also working with the group orchestrating the hijacking.

When the Iraqi men eventually received a phone call notifying them that the United States military was en route, the men packed up and left with Decedents as captives. Other individuals were left behind and were able to relay the aforementioned facts. Plaintiffs have since been told, among other things, that the kidnapping took place in full view of the United States military, but that the Government did nothing to intercede.

According to Plaintiffs, from this point forward, "federal officials who were assigned to assist the families while they sought the return of their adult children, such as Defendant Jennifer Foo, actually worked to impede the families' work and created 'government policies' to block their efforts to save their sons." Complaint, p. 7, ¶ 7. Members of the State Department, including Defendant Foo, also allegedly: 1) failed or refused to relay information to

---

1. The following facts are derived from Plaintiffs' Complaint.

2. Plaintiffs sued Crescent in a related case, *Munns v. Crescent Security Group, Inc., et al.,* 2:09–cv–00981–MCE–EFB. While it appears from that docket that Plaintiffs have never served any of those defendants or in any other way actively pursued prosecution of that action, Plaintiffs' counsel clarified at oral argument that Plaintiffs have in fact spent thousands of dollars and a significant amount of time in attempting to locate Crescent's principal, who is believed to be somewhere in the Middle East, but who has, to date, alluded Plaintiffs' efforts.

Plaintiffs; 2) advised members of the families they should not meet with an individual who had reportedly obtained information on the location and condition of the missing men; 3) refused to distribute or blocked the distribution of leaflets asking for information about the hostages; 4) told families the FBI was pursuing leads that would not be described; and 5) claimed to have relevant information that could not be relayed to Plaintiffs because it was "classified."

More specifically, Plaintiffs allege, among other things, that they had collected funds and prepared 90,000 flyers (printed in English and Iraqi) for distribution in the Middle East. These flyers offered a reward for information pertaining to the missing men, but the State Department blocked their distribution.

In addition, though Plaintiffs were provided with audio and video "proofs of life," the United States refused to make contact with the kidnappers under the policy that "America does not negotiate with terrorists." Plaintiffs dispute whether the United States actually considers the kidnappers in this case to be "terrorists" or simply considers them "common criminals."

After the families saw little progress in either the location or rescue efforts, the United States Drug Enforcement Administration ("DEA") interceded in the matter on behalf of a DEA employee who was a family member of one of the missing men. The DEA determined that the kidnappers had given up trying to negotiate with the United States because the kidnappers believed they had no "negotiating partner." As an apparent last resort, the kidnappers eventually cut off one of each Decedents' fingers, later obtained by the DEA, and still the United States would not negotiate. Decedents were thereafter brutally beaten, tortured and beheaded. Only then, after their deaths, did the United States finally negotiate for the return of Decedents' bodies.

Plaintiffs contend that, throughout this ordeal, they were provided very little information by either the United States Government or Crescent. Plaintiffs still have not been given employment contracts, life insurance information or other related employment documents. In addition, Plaintiffs allege Crescent has improperly withheld life insurance benefits that are due the families and has required the families to sign releases of liability in order to receive those funds. Plaintiffs believe they are entitled to these life insurance proceeds and potentially to back pay due the kidnapped men. According to Plaintiffs, the Secretary, for her part, has "refused to provide, or was incapable of providing, even the most basic information, such as copies of Crescent Security contracts, Lloyd's of London life insurance information" or other documents. *Id.,* p. 11, ¶ 17.

In light of the lack of information received from the Government, Plaintiffs have purportedly had to rely on third parties for information. For example, Plaintiffs allege they heard rumors that the kidnapping may have been motivated by revenge for incidents that occurred as a result of the passage of the Coalition Provision Authority ("CPA") Order 17, which is allegedly a State Department regulation creating absolute immunity for private contractors killing anyone in Iraq. Plaintiffs also garnered information from the book "Big Boy Rules, America's Mercenaries Fighting in Iraq," by Steve Fainaru.

Ultimately, as a result of the above events, Plaintiffs initiated this suit alleging causes of action for: 1) declaratory relief; 2) Procedural Due Process Clause violations; and 3) violations of the Takings Clause of the United States Constitution. Plaintiffs seek damages and injunctive re-

lief and ask the Court to make the following declarations:

Whether CPA (Coalition Provision Authority) Order 17, was and is a proper application of government authority under the United States Constitution when it provided for a complete waiver of all laws, including those of Iraq and those enacted by the United States Congress. Complaint, p. 15, ¶ 26(a).

Whether as a consequence of CPA Order 17, Iraq became a "free fire zone" where contractors were allowed to shot [*sic*] at anything with complete impunity t [*sic*] whenever they felt, in their sole discretion, physically threatened. *Id.*, p. 16, ¶ 26(b).

Whether CPA Order 17 gave rise to and helped foster the contractor and subcontractor culture in Iraq, where companies like Crescent literally sprang up overnight and were nothing more than a folding table, some stationary, and a couple beat-up trucks with AK–47 machine guns, but sanctioned to do business on behalf of the United States and listed by the Secretary of State and Department of Defense as legitimate business entities. *Id.*, p. 16, ¶ 26(c).

Whether the numbers and statistics have been so skewed throughout the Iraq conflict that no one in the Office of the Secretary State can really tell Plaintiffs how much money we spent and how many contractors employed by the United States have been lost; in essence, who is doing the fighting for the United States. *Id.*, p. 16, ¶ 26(d).

[W]hat the parameters are of the "War on Terror" and who exactly the United Stats [*sic*] is fighting. *Id.*, p. 17, ¶ 26(e). [H]ow far federal immunity extends to a private contractor like Crescent or an American Citizen who is recruited and serves in this war under a private contract that is let through the Secretary of State. Further, what inalienable Constitutional rights are lost or given up by a private citizen, such as the Plaintiffs' sons, when he or she executes such a contract and whether it is a public document that should be made available to the families of those citizens and the public? *Id.*, p. 17, ¶ 26(f).

Within the "War on Terror" how far does a family's Constitutional and Due Process Rights extend? *Id.*, p. 17, ¶ 26(g).

Whether the families of contractors were legally prohibited from negotiating with the kidnappers, who were referred to by President as "common criminals"-in other words, not "terrorists," and what are the origins of this "official policy," and why did it not apply to similarly situated Iraqis. Whether there is an official policy in the United States government that "we do not negotiate with terrorists." *Id.*, p. 17, ¶ 26(h).

What recovery may be made by a family or surviving spouse of a private contractor employed in the 'War on Terror?' And how does one recover under the employment contracts that no one has ever seen, or receive life insurance benefits taken out by the companies in the names of the contractors without anyone's knowledge?" *Id.*, p. 18, ¶ 26(i).

Defendants moved to dismiss on March 7, 2011, arguing as to the Plaintiffs' Complaint against Defendants in their official capacities that: 1) Plaintiffs' claims raise nonjusticiable political questions; 2) Plaintiffs lack standing to seek a declaration or an injunction because they have failed to allege an imminent future injury; 3) Plaintiffs have likewise failed to satisfy the preconditions for injunctive and declaratory relief because they have not alleged a likelihood of future injury; 4) the Court should decline to exercise its discretion to issue injunctive or declaratory relief; 5) sovereign immunity bars Plaintiffs' claims

for compensation; 6) Plaintiffs failed to state a claim under the Takings Clause; and 7) Plaintiffs failed to properly serve Defendants. Defendants also challenged Plaintiffs' claims against them in their individual capacities arguing that: 1) Plaintiffs' claims raise nonjusticiable political questions; 2) this Court lacks personal jurisdiction over the individual-capacity Defendants; 3) venue is improper in this Court; 4) Plaintiffs have failed to properly serve Defendants; 5) Plaintiffs lack a cause of action against Defendants; 6) qualified immunity bars Plaintiffs' claims; and 7) Plaintiffs' claims for an injunction and declaratory relief are improper.

Plaintiffs opposed Defendants' Motions on April 28, 2011, and Defendants replied on May 12, 2011. In their Oppositions, Plaintiffs argue that, in addition to their above expressly identified causes of action, they have also alleged sufficient facts within their Complaint to state a cause of action under the First Amendment. Plaintiffs also subsequently filed an Objection and Motion to Strike and a Request for Judicial Notice. For the following reasons, Defendants' Motions are GRANTED with leave to amend. Plaintiffs' Requests are DENIED.

## ANALYSIS

### A. The Political Question Doctrine

Defendants first move to dismiss Plaintiffs' Complaint in its entirety on the basis that each of Plaintiffs' claims present nonjusticiable political questions. Despite the persuasiveness of Defendants' position on its face, this Court accepts their argument only in part.

**3.** All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

### 1. Standard governing a motion to dismiss pursuant to the political question doctrine.

 "[I]f a case presents a political question, [the Court] lack[s] subject matter jurisdiction to decide that question." *Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 982 (9th Cir.2007). Federal Courts are presumptively without jurisdiction over civil actions, and the burden of establishing the contrary rests upon the party asserting jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Lack of subject matter jurisdiction is never waived and may be raised by either party or the Court at any time. *Attorneys Trust v. Videotape Computer Prod., Inc.,* 93 F.3d 593, 594–95 (9th Cir.1996).

 In moving to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1),[3] the challenging party may either make a facial attack on the allegations of jurisdiction contained in the complaint or can instead take issue with subject matter jurisdiction on a factual basis. *Thornhill Publ'g Co. v. Gen. Tel. & Elect. Corp.,* 594 F.2d 730, 733 (9th Cir.1979); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3rd Cir.1977). If the motion constitutes a facial attack, the Court must consider the factual allegations of the complaint to be true. *Williamson v. Tucker,* 645 F.2d 404, 412 (5th Cir.1981); *Mortensen,* 549 F.2d at 891. If the motion constitutes a factual attack, however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill,* 594 F.2d at 733 (quoting *Mor-*

*tensen,* 549 F.2d at 891). The court may properly consider extrinsic evidence in making that determination. *Velasco v. Gov't of Indon.,* 370 F.3d 392, 398 (4th Cir.2004). Defendants here facially attack Plaintiffs' Complaint.

■ A court granting a motion to dismiss a complaint must decide whether to grant leave to amend.[4] Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment...." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the *Foman* factors as those to be considered when deciding whether to grant leave to amend). Not all of these factors merit equal weight. Rather, "the consideration of prejudice to the opposing party ... carries the greatest weight." *Eminence Capital,* 316 F.3d at 1052 (citing *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 185 (9th Cir.1987)). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." *Intri–Plex Techs. v. Crest Group, Inc.,* 499 F.3d 1048, 1056 (9th Cir.2007) (internal citations and quotations omitted).

## 2. The political question analysis.

"The political question doctrine is an important tenet of separation of powers and judicial restraint. But the doctrine is notorious for its imprecision, and the Supreme Court has relied on it only occasionally ... 'That the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the Supreme Court and among scholars.' "

*Harbury v. Hayden,* 522 F.3d 413, 418 (D.C.Cir.2008) (*quoting Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 803 n. 8 (D.C.Cir.1984) (Bork, J. Concurring) (citations omitted)). Indeed, "[a]lthough the political question doctrine often lurks in the shadows of cases involving foreign relations, it is infrequently addressed head on." *Alperin v. Vatican Bank,* 410 F.3d 532, 538 (9th Cir.2005). Nonetheless, " '[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.' " *Id.* at 544 (*quoting Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803)).

"In the landmark case of *Baker v. Carr,* the Supreme Court provided its most comprehensive discussion of the application of the doctrine. Recognizing that the attributes of the political question doctrine 'diverge, combine, appear, and disappear in seeming disorderliness' in various settings, the Court set out to illuminate the 'contours' of the doctrine." *Id.* (*quoting Baker v. Carr,* 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The Court thus set forth six factors for consideration in determining whether resolution of a case should be deferred to the political branches. *Id.* Namely, the *Baker* Court opined that:

> [p]rominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without ex-

---

4. The Court only articulates the standard governing leave to amend once here, with reference to the instant discussion. This same standard, however, is relied upon by the Court, as relevant, throughout this Order.

pressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question. 369 U.S. at 217, 82 S.Ct. 691. "Dismissal on the basis of the political question doctrine is appropriate only if one of these formulations is 'inextricable' from the case." *Alperin,* 410 F.3d at 544.

The *Baker* Court cautioned, however, "against 'sweeping statements' that imply all questions involving foreign affairs are political ones." *Id.* at 544–45 (*quoting Baker,* 369 U.S. at 211, 82 S.Ct. 691). "Instead, the Court instructed that courts should undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance." *Id.* at 545. "Nevertheless, 'cases interpreting the broad textual grants of authority to the President and Congress in the areas of foreign affairs leave only a narrowly circumscribed role for the Judiciary.'" *Corrie,* 503 F.3d at 982 (*quoting Alperin,* 410 F.3d at 559).

### a. The parties' respective positions.

Defendants argue that Plaintiffs' claims are nonjusticiable because Plaintiffs seek resolution of "sensitive questions of foreign and military policy constitutionally reserved to the political branches." United States' Motion, 3:13–15. According to Defendants, Plaintiffs' claims thus conflict with all six factors articulated above in *Baker,* 369 U.S. at 217, 82 S.Ct. 691.

First, according to Defendants, the issues raised in this case, which Defendants broadly characterize as "the State Department's handling of a kidnapping by insurgents in a war zone and decisions about the use of contractors in Iraq," are textually committed by the Constitution to the political branches. *Id.,* 4:9–17 (*citing Corrie,* 503 F.3d at 982 (quoting *Alperin,* 410

F.3d at 559; *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1919); *Schneider v. Kissinger,* 412 F.3d 190, 194–95 (D.C.Cir.2005)). Defendants acknowledge, as they must, that "not every case touching on foreign relations is nonjusticiable," but they nonetheless contend that nonjusticiability is clear here because "Plaintiffs challenge such delicate matters of foreign and military policy as diplomats' approach to a particular kidnapping in a foreign war zone, policies about how and whether to use private contractors in Iraq, and even the scope of the conflict in Iraq." *Id.,* 5:2–8 (internal citations omitted). Defendants further argue that the second and third *Baker* tests are satisfied because Plaintiffs' claims are not capable of resolution through judicially discovery and manageable standards, but instead require nonjudicial policy decisions. *Id.,* 5:9–11. According to Defendants, the courts lack competence to address strategic military decisions or to make political judgments, as opposed to legal determinations. Finally, Defendants argue the last three *Baker* factors are satisfied because there is a real risk in this case of sending a conflicting message regarding decisions already made by a coordinating branch of government. *Id.,* 6:1–12.

Plaintiffs, though admitting that "[b]ecause the text of the U.S. Constitution commits controversies revolving around foreign affairs and the armed forces to the President, the political question doctrine may preclude from judicial review cases involving military strategy, tactical decision-making, or calculated operations," nevertheless argue that "Article II does not grant the Executive Branch the authority to step outside the United States Constitution." Plaintiffs' Opposition to United States' Motion to Dismiss ("Opp. to United States' Motion"), 8:18–23. Plaintiffs generally contend that their claims either present justiciable questions or that

justiciability cannot be determined based solely on the Complaint and absent at least some discovery. According to Plaintiffs, the following issues are particularly justiciable: "(1) ... the issuance of Order No. 17, which is facially Unconstitutional and exempts certain individuals from all operation of all laws, including the United States Constitution; (2) the interference by the Plaintiffs' First Amendment Rights (particularly Defendant Jennifer Foo), such as the instructions that they not be allowed to disseminate printed leaflets, and that the Plaintiffs not communicate with certain individuals, including the criminals who were holding their children; and (3) refusal to follow acts of Congress designed to protect and to compensate the Plaintiffs." *Id.*, 8:24–9:7. Plaintiffs thus argue there is no need for this Court to make sensitive determinations regarding the handling of a kidnapping in a war zone, because Plaintiffs simply ask the Court to evaluate "Defendants' performance of their duties in an unauthorized and unconstitutional manner." *Id.*, 9:15–18.

More specifically as to the *Baker* factors, Plaintiffs argue:

> While the first *Baker* factor may preclude a plaintiff from suing for injuries in a war zone where the alleged wrongs stemmed from the military's strategic and tactical decisions, it does not preclude a plaintiff and their family from suing for injuries stemming from Defendants' decisions to the extent they conflict with military directives or breach a contract or violate basic Constitutional rights.

*Id.*, 9:20–26. As to the second *Baker* factor, Plaintiffs assert that they only ask "the Court to adjudicate very clear standards of property rights, traditional tort and contract claims, and Constitutional standards that are not novel issues that lack discoverable and manageable standards." *Id.*, 11:1–4. According to Plain-

tiffs, "unlike combat or training operations, the facts of this case are not peculiarly 'military' in nature, and the Court may apply traditional legal principles to resolve their claims." *Id.*, 11:4–6. Plaintiffs believe the third, fourth and sixth *Baker* factors are not implicated here because the Court need not formulate any military policies to resolve this case and because Plaintiffs' claims can be adjudicated without disrespecting or embarrassing the coordinate branches of government. Finally, Plaintiffs contend the fifth *Baker* factor, which looks at whether there is an unusual need for unquestioning adherence to a political decision already made, is inapplicable to Plaintiffs' claims for violations of the Constitution or withholding of private benefits.

In Reply, Defendants rebut Plaintiffs' arguments by: 1) pointing out that Plaintiffs rely solely on cases in which individuals filed suit against government contractors, not against the United States itself; 2) arguing that to the extent Plaintiffs claim no "military" decisions are implicated in this case, they miss the broader point that "political" questions, not just "military" questions, are precluded from review; 3) challenging Plaintiffs' inference that the type of claim (*i.e.,* tort, contract, constitutional, etc.) is dispositive of whether the political question doctrine acts as a bar; and 4) claiming no discovery is necessary to justify Defendants' facial attack on subject matter jurisdiction in this case.

**b. Application of the doctrine.**

Contrary to the case law, which requires a discriminating (and even "surgical") inquiry into each of Plaintiffs' claims, neither Defendants nor Plaintiffs actually engage in such an undertaking. *See Alperin,* 410 F.3d at 547 (taking a "surgical" approach to the *Baker* factors). Instead, both sides argue generally why the Complaint in its entirety is or is not barred. For purposes

of the current analysis, however, this Court is required to examine each of Plaintiffs' causes of action separately. As will become increasing clear, application of the political question doctrine is thus almost entirely dependent on the characterization of Plaintiffs' claims.

Plaintiffs' causes of action are most appropriately analyzed when broken into two categories. Generally speaking, Plaintiffs' first set of claims includes their declaratory relief cause of action and their injunctive relief causes of action (Procedural Due Process and First Amendment[5] claims). Plaintiffs' second set of claims is comprised of the various iterations of their Takings cause of action.[6]

### (i) Plaintiffs' first set of claims.

■ Pursuant to their first set of claims, Plaintiffs seek declarations generally pertaining to: 1) the United States' use of civilian contractors in Iraq, the scope of the policies governing those contractors, and the consequences of those policies; 2) the parameters of the "War on Terror"; 3) the extent of immunities enjoyed by contractors working in Iraq and the scope of constitutional rights lost or forgone by those contractors or their families; 4) the United States' handling of a kidnapping by Iraqi insurgents in an Iraqi war zone, which includes the Government's decisions regarding negotiation protocols and policies regarding information dissemination; and 5) the availability and extent of the recovery that may be had by survivors of contractors killed during the War on Terror. In addition, Plaintiffs seek recovery on Procedural Due Process grounds, alleging that they "have a constitutionally protected interest in the lives of their children" and that Defendants deprived them of that constitutionally protected interest "without due process through the use of 'underground regulations,' 'unwritten policies,' and while illegally retaining vendors who were improperly compensated." Complaint, p. 19, ¶¶ 30–31. Plaintiffs thus seek an injunction "against Defendants' violations of rights to Due Process guaranteed by the United States Constitution." *Id.*, p., 19, ¶ 33. Finally, Defendants assert First Amendment violations based on their allegations that the Government advised Plaintiffs not to meet with individu-

---

**5.** Though Plaintiffs did not expressly identify a cause of action arising under the First Amendment in their Complaint, the Court finds, and Defendants do not seriously contend otherwise, that Plaintiffs have alleged sufficient facts to state such a claim. *See, e.g., Smith v. Arkansas State Highway Emp., Local 1315,* 441 U.S. 463, 464, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) ("The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances … The government is prohibited from infringing upon these guarantees either by a general prohibition against certain forms of advocacy … or by imposing sanctions for the expression of particular views it opposes.") (internal citations omitted); see also *Alvarez v. Hill,* 518 F.3d 1152, 1157 (9th Cir.2008) ("A complaint need not identify the statutory or constitutional source of the claim raised in order to survive a motion to dismiss.").

**6.** According to Plaintiffs' Complaint, their Takings claim is premised on either the Government's taking of the Decedent's "work" or of Decedent's "lives," but in their Opposition, Plaintiffs take the position that this cause of action is instead premised on the Government's failure to provide Decedents' survivors with federal benefits due. As will be discussed in Section B(2)(b) below, the taking of Decedents' lives is not the proper subject of a Takings claim. If this theory of recovery was viable, the Court notes it likely would be more properly analyzed in conjunction with Plaintiffs' first set of claims. Because this theory fails as a matter of law, however, it is grouped here for the Court's convenience. Plaintiffs' other theories are likewise dismissed on alternative bases below. However, in the interest of resolving the threshold jurisdictional issue before the Court, it will nonetheless be presumed for purposes of the instant analysis that those claims are properly stated.

als who reportedly had information pertaining to Decedents' whereabouts and that the Government blocked the distribution of flyers prepared by Plaintiffs offering a reward for information pertaining to the missing men. Given the policy-driven nature each of the above claims, the Court now holds, pursuant to the following authorities, that each of Plaintiffs' first set of claims present nonjusticiable political questions.

First, in *Gilligan v. Morgan,* the United States Supreme Court held nonjusticiable First Amendment speech and assembly claims brought by students of Kent State University. 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). In that case, the students sought an injunction limiting the Governor of Ohio's ability to call upon National Guard troops to respond to civil disorder. *Id.* at 3, 93 S.Ct. 2440. The students further sought to restrain the National Guard from violating their rights in the future and sought declaratory relief as to the constitutionality of a portion of the Ohio Revised Code. *Id.* The majority of the plaintiffs' claims were dismissed by the district court, the opinion of which was affirmed on appeal. The appellate court, however, remanded to the district court for consideration of the following question:

> Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?

*Id.* at 4, 93 S.Ct. 2440.

As a threshold matter, the Supreme Court stressed the fact that "this [was] not a case in which damages [were] sought for injuries sustained during the tragic occurrence at Kent State. Nor [was] it an action seeking a restraining order against some specified and imminently threatened unlawful action. Rather, it [was] a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National guard. [That] far-reaching demand for relief present[ed] important questions of justiciability." *Id.* at 5, 93 S.Ct. 2440.

Turning then to a more specific analysis of the students' claims, the Court observed that Congress is constitutionally vested with the power to organize, arm and discipline a Militia. *Id.* at 6, 93 S.Ct. 2440 (quoting U.S. Const., art. I, § 8, cl. 16). In turn, Congress had passed legislation delegating to the President, as the Commander in Chief of the Armed Forces, the power to regulate the organization and discipline of the National Guard. *Id.* at 6–7, 93 S.Ct. 2440. Accordingly, "[t]he relief sought by [the students], requiring initial judicial review and continuing surveillance by a federal court over the training, weaponry and orders of the Guard, would ... embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government." *Id.* at 7, 93 S.Ct. 2440. The students' claims thus conflicted with each of the *Baker* factors, rendering their Complaint nonjusticiable. *Id.* at 8–9, 93 S.Ct. 2440.

Indeed, that Court observed:

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible-as the Judicial Branch is not-to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force

are essentially professional military judgments, subject always to civilian control of the Legislative and Executive branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system.

*Id.* at 10, 93 S.Ct. 2440.[7]

Plaintiffs' first set of claims here are similar to those brought in *Gilligan* because Plaintiffs seek broad-reaching judicial regulation over the Government's handling of kidnappings overseas as well as the Government's decisions pertaining to the use of contractors in Iraq. Just as in *Gilligan*, there can be no doubt that the Constitution delegates to the Executive Branch the power to regulate the military and to act in the area of foreign affairs. *See Corrie*, 503 F.3d at 983 ("It is well established that the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.") (internal citations and quotations omitted); *Alperin*, 410 F.3d at 559 ("It is axiomatic that the Constitution vests the power to wage war in the President as Commander in Chief. . . ."); *Tiffa-*

*ny v. United States*, 931 F.2d 271, 277 (4th Cir.1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense . . . The strategy and tactics employed on the battlefield are clearly not subject to judicial review."); *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir.1997) ("Foreign policy and military affairs figure prominently among the areas in which the political question doctrine has been implicated.").[8] Like the *Gilligan* claims, Plaintiffs' requests for declaratory and injunctive relief thus seek to second-guess foreign affairs or military decisions made in a context in which these decisions have been constitutionally delegated to the Executive Branch. Indeed, Plaintiffs seek to dictate the manner in which the Government responds to the kidnapping of American citizens in a foreign war zone, as well as the type and breadth of information disseminated by the Government to both the families of the victims and the kidnappers themselves. Plaintiffs likewise ask this Court to evaluate the scope of Government policies concerning negotiations with "terrorists," by official nomenclature or by any other name, and concerning the use of contractors overseas and in the War on Terror generally. These "far-reaching" inquiries would require this Court to insert itself into the conduct of foreign affairs and of the United States military. Accord-

---

7. In reaching its holding, the Court nonetheless made clear that it "neither [held] nor [implied] that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief." *Id.* at 11–12. This caveat will become important in evaluating Plaintiffs' second set of claims.

8. At least one court has also observed that "[u]nlike the political branches, the Judiciary

has no covert agents, no intelligence sources, and no policy advisors. Courts are thus institutionally ill-equipped to assess the nature of battlefield decisions or to define the standard for the government's use of covert operations in conjunction with political turmoil in another country. These types of decisions involve delicate, complex policy judgments with large elements of prophecy, and are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility." *Al–Aulaqi v. Obama*, 727 F.Supp.2d 1, 45 (D.D.C.2010) (internal quotations and citations omitted).

ingly, under *Gilligan*, Plaintiffs first set of claims is nonjusticiable.

The Ninth Circuit's decision in *Corrie*, 503 F.3d 974, further supports this Court's conclusion here. In *Corrie*, the appellate court affirmed dismissal on political question grounds of a challenge brought by individuals against Caterpillar, Inc., after bulldozers purchased from Caterpillar by the Israeli Defense Forces ("IDF"), and paid for by the United States, were used to demolish homes in the Palestinian Territories. *Id.* at 977. The *Corrie* plaintiffs claimed Caterpillar had actual and constructive notice that the IDF would use the bulldozers to destroy Palestinian homes and that Caterpillar's sales thus violated international law. *Id.* As a result, the plaintiffs alleged causes of action for: "(1) war crimes; (2) extrajudicial killing under the Torture Victim Protection Act; (3) cruel, inhuman, or degrading treatment or punishment; (4) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*; (5) wrongful death; (6) public nuisance; and (7) negligent entrustment." *Id.* at 979. Those plaintiffs sought, among other things, compensatory and punitive damages, declaratory relief and an injunction "directing Caterpillar to cease providing equipment to the IDF so long as its illegal practices continue." *Id.*

In holding plaintiffs' claims nonjusticiable, the *Corrie* court reasoned:

> The decisive factor here is that Caterpillar's sales to Israel were paid for by the United States. Though mindful that we must analyze each of the plaintiffs' 'individual claims,' each claim unavoidably rests on the singular premise that Caterpillar should not have sold its bulldozers to the IDF. Yet these sales were financed by the executive branch pursuant to a congressionally enacted program calling for executive discretion as to what lies in the foreign policy and

national security interests of the United States.

*Id.* at 982 (internal citations omitted). Accordingly, the *Corrie* court determined that several of the *Baker* factors were implicated by those plaintiffs' claims. *Id.* at 982–83. Namely, as discussed above, the first factor was implicated because the conduct of foreign relations is constitutionally committed to the political branches. *Id.* at 983. Likewise, the fourth, fifth and sixth *Baker* factors were implicated because foreign aid was not only committed to the political branches, but those branches had already made a decision as to that aid. *Id.* at 983. More to the point, since the Executive Branch had already made the policy determination that the bulldozers should be purchased, a contrary finding by the *Corrie* court would necessarily have questioned, or even condemned, the Executive's stated foreign policy. *Id.* at 983–84.

Similarly in the current case, as already stated, Plaintiffs' first set of claims asks the Court to delve into areas of military and foreign affairs committed to the political branches. In addition, the Executive Branch has already made its determination as to how it uses contractors in foreign military operations, how it handles kidnappings arising in the Iraqi war zone, and how much information, if any, should be released to families. Were the Court to issue an opinion deciding Plaintiffs' claims at this point, as in *Corrie*, the Court would very well be questioning, or even condemning, that Executive action already taken. Accordingly, under *Corrie*, as under *Gilligan*, Plaintiffs' first set of claims is nonjusticiable.

Another Ninth Circuit decision, *Alperin*, 410 F.3d 532, further supports a nonjusticiability finding here. The *Alperin* court was faced "with the question whether claims for losses allegedly suffered at the hands of a Nazi puppet regime during

World War II [were] cognizable." *Id.* at 537. The plaintiffs, individuals and organizations referred to collectively as the "Holocaust Survivors," claimed that the Vatican Bank, among others, "profited from the genocidal acts of the Croatian Ustasha political regime (the 'Ustasha'), which was supported throughout World War II by Nazi forces." *Id.* at 538. "That profit allegedly passed through the Vatican Bank in the form of proceeds from looted assets and slave labor." *Id.* Plaintiffs thus alleged causes of action for "conversion, unjust enrichment, restitution, the right to an accounting, and human rights violations and violations of international law arising out of the defendants' alleged involvement with the Ustasha during and following World War II." *Id.* The district court dismissed all claims on political question grounds, but the appellate court reversed as to the plaintiffs' property claims, which are discussed in the following section, noting with respect to the Holocaust Survivors' "War Objectives Claims, [that] the district court should refrain from hearing those claims that require passing judgment on foreign policy decisions." *Id.* at 538, 558.

The War Objectives Claims were based on numerous allegations that the defendants had violated international law. *Id.* at 559. However, in *Alperin,* the Executive Branch had already exercised its authority pertinent to the evaluation of such alleged violations in a myriad of ways, including through the Nuremberg trials. *Id.* For its part, the *Alperin* court thus observed that, as a court of the judicial branch, it was not a war crimes tribunal and that "[t]o act as such would require [it] to intrud[e] unduly on certain policy choices and value judgments that are constitutionally committed to [the political branches,] for [it did] not and [could] not

know why the Allies made the policy choice not to prosecute the Ustasha and the Vatican Bank." *Id.* at 560 (internal citations and quotations omitted). Accordingly, to adjudicate the War Objectives Claims would have been to invade the province of the Executive.

Here, too, for the reasons already discussed, resolution of Plaintiffs' first set of claims would contravene the *Baker* factors and would require this Court to render policy proclamations regarding issues committed to and already decided by the political branches. More to the point, resolution of Plaintiffs' first set of claims would almost inevitably require the Court to evaluate and judge existing conditions in Iraq, which would include evaluating military strategies and policies governing the use of contractors, the parameters of America's "War on Terror" and all other turbulent and changing circumstances relating to the United States' occupation of that nation. Likewise, any of Plaintiffs' requested declarations issued in the abstract would require the Court to render a decision that could embarrass the coordinate branches and conflict with their existing proclamations regarding the propriety of the United States' decisions not to negotiate with terrorists, and, relatedly, to control the information disseminated to families and third parties regarding a kidnapping occurring overseas during a time of war. This Court simply cannot conceive of all of the justifications for the Executive Branch's decisions in this case, nor does this Court have access to nearly the same resources employed by that branch in reaching its conclusions regarding how to best proceed in managing an international conflict. Defendants' Motion to Dismiss Plaintiffs first set of claims pursuant to the political question doctrine is thus granted with leave to amend.[9]

---

9. This conclusion is supported by a number of additional cases as well. *See Tiffany,* 931 F.2d 271 (negligence action brought by wife of pilot killed in a mid-air collision with a

## (ii) Plaintiffs' second set of claims.

█ Pursuant to their second set of claims, which is comprised of Plaintiffs' various theories underlying their Takings cause of action, Plaintiffs allege that the "Constitution prohibits the State of California from taking private property including the lives of the Plaintiffs' children and the work they performed for public use without just compensation." [10] Complaint, p. 20, ¶ 35. Based on the allegations in their Complaint, it appears Plaintiffs contend that the property wrongfully taken from them included: 1) the lives of Dece-

dents; [11] and 2) the compensation still owed Decedents for work performed for Crescent. In Opposition to Defendants' instant Motions, however, Plaintiffs also argue Decedents were entitled to compensation directly from the United States Government (*i.e.*, benefits under The Defense Base Act ("DBA"), 42 U.S.C. § 1651 *et seq.*, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, and the War Hazards Compensation Act ("WHCA"), 42 U.S.C. § 1701 *et seq.*). Opp. to United States' Motion, 5:15–27. Assuming the viability of

United States fighter jet dispatched to visually identify the pilot's aircraft when he flew into a United States Air Defense Identification Zone without filing a flight plan presented a nonjusticiable political question because "it [was] difficult to conceive of an area of governmental activity in which the courts have less competence," and "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches"); *Smith v. Reagan*, 844 F.2d 195 (4th Cir.1988) (suit asking "the courts to determine whether American service personnel remain in captivity in southeast Asia and to assess the adequacy of the executive's efforts to secure the release of any who do" was "fraught with peril for the judiciary" because it would require the courts "to intrude in the conduct of sensitive diplomatic negotiations," to "make determinations of fact in an area where the judiciary lacks power to obtain information, and in which it has neither expertise to evaluate the information brought before it nor standards to guide its review," and might result in cases in which "the judiciary may speak with multiple voices in an area where it is imperative that the nation speak as one"); *Aktepe*, 105 F.3d 1400 (suit filed by Turkish Navy sailors against the United States for death and personal injuries resulting from the United States' firing of live missiles at a Turkish ship during NATO training exercises simulating live attacks was nonjusticiable because the issues raised conflicted with some, if not all, of the *Baker* factors); *El–Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C.Cir.2010) (suit brought by

owners of Sudanese pharmaceutical plant alleging claims as to "whether the United States' attack on the plant was 'mistaken and not justified' " and as to the "factual validity of the government's stated reasons for the strike" were non-justiciable); *Harbury*, 522 F.3d 413 (claims by widow of rebel fighter killed by members of the Guatemalan army against United States government officials arguing they were responsible for her husband's physical abuse and eventual death were nonjusticiable); *Schneider*, 412 F.3d 190 (suit brought by the children and estate of a Chilean general against the United States and the former national security advisor to recover for the government's role in the kidnapping, torture and death of the general was nonjusticiable under the first through fourth *Baker* factors); *Al–Aulaqi*, 727 F.Supp.2d 1 (suit brought by alien father on behalf of his son, a duel American and Yemeni citizen, against the President, the Secretary of Defense and the Director of the CIA arguing defendants unlawfully authorized the "targeted killing" of plaintiff's son based on his alleged ties to a group affiliated with al Qaeda was nonjusticiable under the first, fourth, and sixth *Baker* factors).

**10.** Though Plaintiffs allege that the "State of California" is precluded from taking private property without just compensation, for the purposes of this Order it will be presumed Plaintiffs meant the United States.

**11.** As stated in Note 6 above, the Court will not address this theory, which fails as a matter of law, in this Section. It is included here simply for uniformity.

these remaining theories for purposes of this jurisdictional discussion, the Court now finds each of these claims justiciable.

First, as stated above, the *Gilligan* Court left open the possibility that some claims involving the military may be viable. 413 U.S. at 11–12, 93 S.Ct. 2440. This caveat was later relied upon in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), a case arising out of the same Kent State incident as did *Gilligan.* In *Scheuer,* without explicitly addressing the political question doctrine, the Supreme Court implicitly determined claims brought by the estates of three students killed during the underlying Kent State tragedy and seeking to recover damages from the Governor of Ohio, the Adjutant General and his assistant, officers and enlisted members of the National Guard and the president of Kent State were justiciable. *Id.* at 234, 94 S.Ct. 1683. Accordingly, while *Scheuer* was not a political question case *per* se, it does serve to indicate that some damages suits against government actors should be permitted to proceed despite the nonjusticiability of other claims arising out of the same factual predicate.

Plaintiffs' Takings claims are more akin to the damages claims alluded to in *Gilligan,* and directly at issue in *Scheuer,* than to the claims actually adjudicated in *Gilligan* because, by their claims, Plaintiffs do not necessarily challenge the Government's general policies in the realm of foreign affairs or military strategy, but instead simply seek either compensation for work performed or some other manner of monetary benefits. From the face of Plaintiffs' Complaint, resolution of the property claims would not require the Court to trespass into areas constitutionally relegated to the coordinate branches and, instead, would simply require the Court to analyze causes of action historically conducive to judicial review. *See, e.g., Al–Aulaqi,* 727 F.Supp.2d at 50 (discussing cases in which "U.S. citizens have been permitted to sue the United States for alleged unconstitutional takings of their property by the U.S. military abroad").

The Ninth Circuit's decision in *Alperin,* 410 F.3d 532, which was discussed above in support of the nonjusticiability of Plaintiffs first set of claims, also supports a finding that Plaintiffs' second set of claims is justiciable. While the district court in *Alperin* dismissed all claims on political question grounds, the appellate court reversed in part, holding that Plaintiffs' property claims (conversion, unjust enrichment, restitution, and an accounting) were not so barred. *Id.* at 538. As to those property claims, that court determined none of the *Baker* tests were inextricable from the analysis and that "[s]imply because a foreign bank [was] involved and the case [arose] out of a 'politically charged' context [did] not transform [those claims] into political questions." *Id.* at 548.

More specifically in that case as to the first *Baker* factor, "unlike some World War II-era claims, the Holocaust Survivors' claims [were] not expressly barred by treaty," nor were they the subject of executive agreement. *Id.* at 549–50. Accordingly, no formal Executive action would have been contravened by the court's entertaining of the plaintiffs' claims. Absent some relevant executive proclamation, that court concluded that "[r]eparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution." *Id.* at 551.

Addressing the second *Baker* factor, the court determined the property claims could be resolved under judicially discoverable and manageable standards. *Id.* at 556. The relevant inquiry was "whether

the courts are capable of granting relief in a reasoned fashion or, on the other hand, whether allowing the Property Claims to go forward would merely provide 'hope' without a substantive legal basis for a ruling." *Id.* at 553. Since the plaintiffs' claims "involve[d] identifiable personal property for which federal statutes, common law, state law, and well-established case law provide concrete legal bases for courts to reach a reasoned decision," the second *Baker* test was not implicated. *Id.* at 553, 555.

The court likewise determined none of the remaining *Baker* factors were at issue because: 1) adjudicating the property claims would not require the court to make any policy pronouncements; 2) the State Department was aware of the appeal, but had declined to intervene; 3) the Holocaust Survivors had not indicated any disagreement with a particular political decision; and 4) there was an absence of "pronouncements" by the political branches that might have been contravened by a decision of the court. *Id.* at 555–58.

Here, as in *Alperin*, Plaintiffs' second set of claims present only a straight-forward property or takings analysis that does not require inquiry into the military or other governmental policies underlying Plaintiffs' above policy-based claims. To the contrary, these claims can likely be resolved without reference to foreign policy or military strategy and instead require only inquiry into well-established standards governing all claims for compensation due. Stated another way, in resolving Plaintiffs' Takings cause of action, which requires the Court only to determine whether certain prerequisites to compensation exist, there will be no reason for the Court to second-guess executive strategy decisions such as why the Government is in Iraq, whether its contractor policies are proper or whether the deaths of Decedents could have been avoided. Accordingly, under *Alperin*, Plaintiffs' second set of claims is justiciable.

Support for the justiciability of Plaintiffs' claims can also be found in *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992). In *Koohi*, the Ninth Circuit rejected a political question challenge to claims brought by the families of civilian passengers of an Airbus shot down by the United States during an undeclared tanker war in the Persian Gulf. *Id.* at 1329, 1332. In that case, Iran and Iraq were engaged in hostilities and Iran began concentrating attacks on ships carrying Iraqi oil and flying under the Kuwaiti flag. *Id.* at 1330. The United States agreed to assist Kuwait to protect its ships, the effect of which was to assist Iraq as well. *Id.* The United States then began to engage in combat with Iranian naval vessels, which eventually led to the incident underlying those plaintiffs' complaints. *Id.*

On the date of the challenged incident, the USS Vincennes, a naval cruiser, dispatched a helicopter to investigate Iranian gunboat activity. *Id.* The helicopter was allegedly fired upon, and the Vincennes crossed into Iranian waters and fired at the gunboats. *Id.* Just a few minutes later, a civilian Iranian Airbus took off and followed its flight path directly into the midst of the conflict. *Id.* The Vincennes crew mistook the Airbus for an Iranian fighter and shot it down, killing all 290 passengers aboard. *Id.*

The *Koohi* plaintiffs asserted two types of claims premised on the construction of the air defense system deployed on the Vincennes: "claims against the United States for the negligent operation of the Vincennes and claims against the weapons manufactures for design defects in the Aegis system." *Id.* The Ninth Circuit held Plaintiffs' claims justiciable because: 1) "governmental operations are a traditional subject of damage actions in federal

courts"; and 2) "federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians." *Id.* at 1331. "A key element in [the court's] conclusion that the plaintiffs' action [was] justiciable [was] the fact that the plaintiffs [sought] only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions." *Id.* at 1332.

Under *Koohi*, Plaintiffs' second set of claims is justiciable for the reasons stated above and because Plaintiffs' damages action is not likely to implicate the same policy and strategy decisions as would Plaintiffs' requests for declaratory or injunctive relief. Namely, if successful, Plaintiffs will recover for past injuries sustained in the taking of labor or the failure to provide benefits, but that recovery would not necessarily require this Court to issue broad and far-reaching relief undermining any Executive decision made as to policies underlying the use of contractors, managing a war-time kidnapping or the proper dissemination of information during a time of war.

Finally, *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C.Cir.1984), *vacated and remanded for reconsideration on other grounds by Weinberger v. Ramirez de Arellano*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), provides further support for a justiciability finding here. In that case, the owner of a private cattle ranch in Honduras, who is referred to individually here though he filed suit on behalf of himself and a number of wholly-owned entities, sued the Secretaries of State and Defense for taking his property, namely his ranch, without his permission by operating a large military training facility for Salvadoran soldiers on part of his land. *Id.* at 1505–06. The plaintiff specifically requested declaratory and injunctive relief for the occupation and destruction of his property without authority and for the deprivation of property without due process. *Id.* at 1505.

The district court held plaintiff's claims nonjusticiable because they challenged "the propriety of the United States military presence in Central America." *Id.* at 1511. The appellate court disagreed, however, finding that plaintiff "[did] not seek to adjudicate the lawfulness of the United States military presence abroad. Instead, [he sought] adjudication of the narrow issue whether the United States defendants may run military exercises throughout the plaintiff's private pastures when their land has not been lawfully expropriated." *Id.* at 1512. Plaintiff did not "challenge the United States military presence in Honduras or in Central America, nor did [he] object to United States sponsorship of a Regional Military Training Center in Honduras." *Id.* According to the appellate court, "[t]his is a paradigmatic issue for resolution by the Judiciary. The federal courts historically have resolved disputes over land, even when the United States military is occupying the property at issue." *Id.* Finally, the plaintiff "[did] not seek judicial monitoring of foreign policy in Central America nor [did he] challenge United States relations with any foreign country. The case [did not] raise the specter of judicial control and management of United States foreign policy." *Id.* at 1513.

The instant case is on par with *Ramirez de Arellano* because, as already stated, the Court need not adjudicate the propriety of any United States policy decisions regarding the use of contractors or the handling of a kidnapping during a time of war to determine whether Plaintiffs are owed

compensation for services performed under the employ of a civilian contractor. The issue here is simply whether civilians working in conjunction with the military are entitled to compensation or benefits from the United States and, if so, what the compensation or benefits might be. Because Plaintiffs' claims do not necessarily challenge the Government's policies underlying the United States' presence in Iraq, and instead simply challenge the Government's alleged retention of funds due Decedents, Plaintiffs' second set of claims is thus justiciable. Accordingly, under the above authorities, Plaintiffs' Takings cause of action, except to the extent premised on the taking of Decedents' lives, is justiciable, and Defendants' Motion to Dismiss that claim pursuant to the political question doctrine is denied.

### (iii) **Plaintiffs' additional case law.**

In Opposition to Defendants' Motions, Plaintiffs rely primarily on three cases, *McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir.2007), *Lane v. Halliburton,* 529 F.3d 548 (5th Cir.2008), and *Carmichael v. Kellogg, Brown & Root Serv., Inc.,* 572 F.3d 1271 (11th Cir.2009). Because these cases are distinguishable on their facts and unremarkable in their holdings, they provide no support for the Plaintiffs' position. Due to the gravity of the harms inflicted and the issues at stake in this case, however, the Court nonetheless takes this opportunity to engage in a brief discussion of those authorities, which are inapplicable here for two reasons. First, each of the above cases involved claims against contractors; the United States was not a Defendant, or even a party, to those disputes. Rather, individuals injured in some manner sued contractors working for the United States military, and those contractors in turn invoked the political question doctrine as a defense. In addition, though Plaintiffs believe those cases stand for the proposition that discovery is necessary to properly evaluate justiciability, dis-

covery was only permitted in those instances because it was not clear from the face of those plaintiffs' complaints that each of plaintiffs' claims was nonjusticiable.

In *McMahon,* the court was faced with claims brought by the survivors of United States soldiers against civilian contractors providing air transportation and operational services overseas after the soldiers were killed when an airplane transporting them crashed into a mountain in Afghanistan. 502 F.3d at 1336. Though it relied on *Aktepe* and *Tiffany* for the proposition that the political branches are constitutionally vested with power over the military, the court observed that the case before it was:

at least one step removed from both [of those cases] because it [was] against a private contractor.... [The private contractor was] not, itself, a coordinate branch of the United States government. Nor [was] it, like the military, part of a coordinate branch of the United States government. To invoke the first *Baker* factor, [the contractor] must therefore carry a double burden. First, it must demonstrate that the claims against it will require reexamination of a decision by the military. Then, it must demonstrate that the military decision at issue is ... insulated from judicial review.

*Id.* at 1359–60 (internal citations omitted) (emphasis omitted).

The *McMahon* plaintiffs' claims arose out of the contractor's staffing, equipping and operation of a flight transporting American soldiers, all of which were contractor responsibilities, and it was not evident from the complaint that any action of the military was implicated. *Id.* at 1360–61. Accordingly, on that facts of that case, and at that early stage in litigation, the court could not say that "resolution of [the]

case [would] require the court to decide a political question." *Id.* at 1365.

The court in *Lane* was similarly faced with a claim brought by civilian truck drivers, or their spouses or dependents, against logistical support services contractors for injuries the drivers sustained in Iraq. 529 F.3d at 554. The truck drivers, who had been promised by the contractors that they would be ensured a safe work environment, were injured or killed by Iraqi insurgents while transporting fuel. *Id.* at 554–55. The plaintiffs alleged: 1) "fraud based claims including fraud and deceit, fraud in the inducement, intentional concealment of material facts, intentional misrepresentation, and civil conspiracy to commit fraud"; and 2) non-fraud based claims, consisting of intentional infliction of emotional distress, negligence and gross negligence, wrongful death and survivorship causes of action. *Id.* at 555. Some plaintiffs also asserted "federal civil rights violations under 42 U.S.C. § 1983 and violations, along with conspiracy to commit violations, of the Racketeer Influenced and Corrupt Organizations Act." *Id.* While the *Lane* court acknowledged that some of Plaintiffs' claims "move[d] precariously close to implicating the political question doctrine, and further factual development very well may demonstrate that the claims are barred," it would have been premature for that court to determine that any political questions would actually be implicated in the resolution of the plaintiffs' suit. *Id.* at 567.

Plaintiffs rely on both of the above cases for the proposition that, either no political question is present here or it is premature to make such a determination. However, as stated, the question of whether decisions of the coordinate branches were implicated by the above plaintiffs' claims was not necessarily apparent from the face of their complaints because the United States was not a party to those actions and be-

cause decisions of the military were not necessarily challenged. To the contrary in this case, Plaintiffs have chosen to sue the Government directly and have directly challenged Executive Branch actions, policies and procedures.

In addition, neither of the above cases stand for the proposition that justiciability questions are always premature when addressed on a less than fully-developed factual record. To the contrary, at this stage in the proceedings, Plaintiffs benefit from the Court's assumption that all facts alleged in the Complaint are true. *Mortensen,* 549 F.2d at 891. It is only if the allegations supporting each of Plaintiffs' claims cannot be construed to state a justiciable claim that dismissal is warranted. At a later stage, however, the facts on which Plaintiffs rely may be more limited, which would likewise also limit Plaintiffs' potential claims. *See McMahon,* 502 F.3d at 1365 ("We expressly do not (and could not) hold that this litigation will not at some point present a political question."); *Lane,* 529 F.3d at 568 ("Permitting this matter to proceed now does not preclude the possibility that the district court will again need to decide whether a political question inextricably arises...."). Indeed, that is precisely what happened in *Carmichael,* 572 F.3d 1271.

In *Carmichael,* the wife of a soldier severely injured while escorting a military convoy through Iraq, sued the civilian contractor she claimed was responsible for negligently causing her husband's injuries. *Id.* at 1275–76. Unlike the above cases, in *Carmichael* the military maintained "plenary control" over the relevant convoys. *Id.* at 1276. Accordingly, early in litigation, the *Carmichael* defendants brought an initial motion to dismiss on justiciability grounds, which motion was denied. *Id.* at 1279. After the close of discovery, however, the defendants renewed their motion,

which was then granted. *Id.* The appellate court affirmed because "adjudicating the plaintiff's claims would require extensive reexamination and second-guessing of many sensitive judgments surrounding the conduct of a military convoy in war time-including its timing, size, configurations, speed, and force protection." *Id.* at 1275. In addition, the court could "discern no judicially manageable standards for resolving plaintiff's claims." *Id.*

Plaintiffs thus rely on *Carmichael* for the proposition that they should be permitted additional time to conduct discovery to show that their claims are justiciable. Plaintiffs' argument is flawed to the extent this Court has already determined that, on the face of Plaintiffs' Complaint, at least as to their first set of claims, Plaintiffs failed to state a justiciable claim. Stated another way, additional discovery is only warranted if Plaintiffs' claims as alleged may, at this point in the proceedings, be justiciable. Based on the above analysis regarding Plaintiffs' first set of claims, they cannot be saved by additional discovery and Plaintiffs' argument is necessarily rejected. To the contrary, Plaintiffs' second set of claims appear justiciable at this point, and thus survive Defendants' initial attack.

Plaintiffs' case law serves then only to support the proposition that the Government could later renew its Motions if facts uncovered through discovery indicate that the Takings cause of action too is barred. Accordingly, Plaintiffs' authority is not helpful to their cause and does little to add to the above analysis.

### 3. Conclusion.

Plaintiffs' first set of claims, comprised of their declaratory relief, Procedural Due Process and First Amendment causes of action, are hereby dismissed with leave to amend as nonjusticiable, while their second set of claims, which is comprised of their Takings cause of action, is not. While this result may seem somewhat unsettling in light of the magnitude of the harms suffered by both Decedents and Plaintiffs, resolution of the political question issue does not turn on the tragic nature of their injuries. To be sure, this Court has the utmost respect for Decedents and their service to this country, and the Court's decision that some of Plaintiffs' claims are barred as nonjusticiable must not in any way be construed to minimize Plaintiffs' loss or to diminish the extent of the grief and anguish Plaintiffs have suffered.[12]

12. Other courts have likewise acknowledged how disconcerting it may be to determine such grievous injuries are not capable of redress before the judiciary. *See Alperin,* 410 F.3d at 562 ("Our decision to affirm the district court's dismissal of the War Objectives Claims is not a result we reach lightly. We do not wish to imply in the slightest that these claims do not represent gravely serious harms for which the Holocaust Survivors deserve relief. The difficulty is that relief lies elsewhere ... In this case, the Holocaust Survivors must look to the political branches for resolution of the War Objectives Claims which, at base, are political questions."); *id.* at 568 (Trott, J., dissenting) ("No one could possibly be comfortable identifying a barrier to the relief sought by these plaintiffs, persons who suffered some of the most unspeakably grievous injuries to their lives and families ... Nevertheless our courts are not the appropriate for redress."); *see also Smith,* 844 F.2d at 202 ("The desire to account for American service personnel still missing after the Vietnam War runs deep. Such an accounting would go far in healing the wounds which remain from that difficult chapter in our nation's history. Perhaps more importantly, it would end the anxiety and frustration, if not all of the pain, borne by the families of these servicemen. We must, however be mindful of the constraints our Constitution places on the judiciary. Our system of government confines each branch to a limited sphere. No one branch of our government can cure all ills, and institutional hubris is more likely than not to result in new and greater ills. In this suit, plaintiffs ask the courts to intrude in an area in which they have no rightful power and no compass.").

## B. Defendants' Motion to Dismiss Plaintiffs' Official Capacity Causes of Action

### 1. Plaintiffs' requests for injunctive and declaratory relief.

#### a. Standing.

Defendants argue Plaintiffs lack standing to pursue their claims for declaratory and injunctive relief because they have failed to allege they are likely to suffer any imminent future injury. A plaintiff bears the burden of establishing "that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009).

To show Article III standing for injunctive relief, a plaintiff must demonstrate the existence of an "imminent and actual" threat of injury that is "not conjectural and hypothetical." *Id.* "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. U.S.*, 599 F.3d 964, 970 (9th Cir.2010) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'" *Id.* at 970 (*quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

In this case, Plaintiffs allege only past injuries as a result of Defendants' conduct. Plaintiffs do not allege that they or any friends or family members are currently serving as civilian contractors or that any of the past harms alleged in the Complaint may for any reason occur again in the future, let alone in the imminent future. Accordingly, Plaintiffs lack standing to pursue their claims for injunctive relief.

Under the same logic, Plaintiffs' declaratory relief claims fail as well. The lack of a controversy of any sufficient immediacy essentially renders Plaintiffs' claims impermissible requests for advisory opinions:

> The federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field. The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy any reality to warrant the issuance of a declaratory judgment.

*Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (internal citations and quotations omitted). As with Plaintiffs' claims for injunctive relief, their declaratory relief claims are entirely premised on past harms and there are no allegations within the Complaint that Plaintiffs might at some point be subject to Defendants' same policies and actions such that any live controversy warranting future declaratory relief exists.

In Opposition to Defendants' Motion, Plaintiffs nonetheless claim they have suffered "injury in fact" and that Defendants continue to deny them benefits pursuant to an official policy to "withhold insurance benefits, back pay, and to avoid federal statutes that allow additional benefits for

all similarly situated persons." Opp. to United States' Motion, 14:16–20. Plaintiffs' argument is flawed in at least two ways. First, Plaintiffs allege no facts indicating that the United States, as opposed to Crescent, withheld any insurance benefits or back pay from Decedents or Plaintiffs, nor do Plaintiffs allege anywhere in their Complaint that they are owed any sort of federal benefits. In addition, Plaintiffs' allegations regarding withheld compensation and benefits are all pled with regards to their Takings claim, under which they seek monetary compensation or damages, not an injunction. Accordingly, by way of their Opposition, Plaintiffs conflate their requests for damages and injunctive relief by essentially arguing that Defendants should be forced, via an injunction, to pay Plaintiffs monies owed. Such relief under the facts alleged in this case would not be injunctive; it would be legal.[13] Plaintiffs' attempts to save their equitable claims thus fail.

Finally, Plaintiffs make at least one reference in the Complaint to their status as taxpayers. To the extent Plaintiffs attempt to allege taxpayer standing, their argument is rejected. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 477, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[T]he expenditure of public funds in an allegedly unconstitutional manner is not an injury sufficient to confer standing, even though the plaintiff contributes to the public coffers as a taxpayer."); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 347, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (taxpayer suits have only been permitted under the Establishment Clause of the Constitution).

Accordingly, in light of these above authorities, Plaintiffs lack standing to pursue their declaratory and injunctive relief claims, and Defendants' Motions to Dismiss those claims is thus granted with leave to amend on this alternative basis as well.

### b. Likelihood of imminent future harm.

The same logic employed in the preceding section is equally applicable to support the conclusion that Plaintiffs' equitable claims must fail on the merits because Plaintiffs have not sufficiently alleged they are likely to suffer imminent future injury. Plaintiffs' equitable remedies can proceed only if there is a "showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again—a likelihood of substantial and immediate irreparable injury." *Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1042 (9th Cir.1999) (quoting *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660) (internal quotations omitted); *id.* at 1044 ("[F]ailure to establish a likelihood of future injury similarly renders ... [claims] for declaratory relief unripe."). Since Plaintiffs have alleged only past harms, Defendants' Motion to Dismiss for Plaintiffs' failure to allege the requisite imminent future harm is granted with leave to amend as to Plaintiffs' declaratory relief, Procedural Due Process and First Amendment claims.

### 2. Plaintiffs' requests for monetary relief.

### a. Sovereign immunity.

Defendants move to dismiss Plaintiffs' requests for monetary relief as barred by

---

**13.** Even if Plaintiffs' characterization of their Takings cause of action as a request for injunctive relief was proper, that characterization would fail for the related reason that monetary damages do not generally constitute irreparable harm. *Goldie's Bookstore, Inc. v.*

*Superior Court of State of Cal.,* 739 F.2d 466, 471 (9th Cir.1984) ("Mere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

the Government's sovereign immunity because Plaintiffs, citing to both 42 U.S.C. § 1983 and the Fifth Amendment, seek to recover "compensation" or "damages." First, Section 1983 does not contain a statutory waiver of the federal government's immunity and thus does not provide an avenue through which Plaintiffs can pursue their monetary claims. *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir.1997); *Taylor v. Donley*, 2010 WL 958067, *4 (E.D.Cal.). In addition, as to Fifth Amendment Takings cause of action, any waiver of immunity is contained in either the Tucker Act, 28 U.S.C. § 1491(a)(2), or the little Tucker Act, 28 U.S.C. § 1346(a)(2), both of which preclude the majority of Plaintiffs' claims in this Court.

The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The Little Tucker Act, in turn, provides for concurrent district court jurisdiction over:

> [a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1346(a)(2). "Read together, these statutes provide for jurisdiction solely in the Court of Federal Claims for Tucker Act claims seeking more than $10,000 in damages, and concurrent district court jurisdiction over claims seeking $10,000 or less." *McGuire v. United States*, 550 F.3d 903, 910–11 (9th Cir.2008).

■ Plaintiffs do not specify in this case the amount of compensation they seek by way of their monetary claims. If Plaintiffs seek to recover less than $10,000, sovereign immunity has been waived and jurisdiction is proper in this Court. If Plaintiffs seek in excess of $10,000, however, their claims must be brought in the Court of Federal Claims. Plaintiffs' failure to allege any jurisdictional amount is thus itself fatal to their instant cause of action. *Karahalios v. Defense Language Inst. Foreign Language Ctr. Presidio of Monterey*, 534 F.Supp. 1202, 1209 n. 6 (N.D.Cal.1982) ("If plaintiff chooses to amend his complaint, he should indicate the amount of the damages he is requesting, so that we can determine whether this case falls within the jurisdictional amount requirement imposed upon us by 28 U.S.C. 1346."); *Hafen v. Pendry*, 646 F.Supp.2d 159, 160 (D.D.C.2009) ("The plaintiff in this case has not satisfied his burden of establishing subject matter jurisdiction by pleading a dollar amount.").

Finally, in Opposition to Defendants' sovereign immunity defense, Plaintiffs attempt to invoke the waiver provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.* Defendants reply that, even assuming Plaintiffs' claims were properly pled, Plaintiffs have still failed to exhaust administrative remedies, therefore depriving this Court of jurisdiction over any FTCA claims. 28 U.S.C. § 2675; *Brady v. United States*, 211 F.3d 499, 502 (9th Cir.2000). Moreover, an FTCA waiver of sovereign immunity is subject to a number of exceptions applicable here. *See* 28 U.S.C. § 2680 (*e.g.*, excepting from waiver of sovereign immunity liability arising from discretionary func-

tions, from claims arising out of combatant activities, and from claims arising in foreign countries). Accordingly, Plaintiffs cannot avoid the sovereign immunity bar by resort to the FTCA, and Defendants' Motion to Dismiss Plaintiffs' monetary claims is thus granted with leave to amend.[14]

### b. Failure to state a claim.

Finally as to their substantive arguments, Defendants contend Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. On a motion to dismiss for failure to state a claim under Rule 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996). Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the [...] claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations. However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal citations and quotations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550

U.S. at 555, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 (3d ed.2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Furthermore, "Rule 8(a)(2) ... requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n. 3, 127 S.Ct. 1955 (internal citations and quotations omitted). Thus, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.* (citing 5 Charles Alan Wright & Arthur R. Miller, *supra*, at § 1202). A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If the "plaintiffs ... have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556, 127 S.Ct. 1955 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■■■ As mentioned briefly above, Plaintiffs' Takings claim is premised on the theory that the Government took the "lives of the Plaintiffs' children and the work

---

**14.** Plaintiffs mention in passing that they "seek the return of specific property and federal benefits, which are not subject to sovereign immunity." Opp. to United States' Motion, 18:19–21. Plaintiffs, however, failed to

allege any facts supporting this theory in their Complaint, and they admit as much in their Opposition. *Id.*, 18:24–25. Accordingly, Plaintiffs newly raised theories do not prevent dismissal here.

they performed for public use without just compensation." Complaint, p. 20, ¶ 35. Plaintiffs' first theory fails because the "taking" of a life is not the proper subject of a Fifth Amendment claim. *See Jones v. Philadelphia Police Dept.,* 2003 WL 193695 *2 (3d Cir.2003) (rejecting argument that "one's body is private property that may be taken by the United States for any governmental purpose of any kind upon the payment of just compensation"). Plaintiffs' latter theory likewise fails because the Complaint contains no allegations that the Government, as opposed to Crescent, took anything from Decedents.

In their Opposition to Defendants' Motions, Plaintiffs thus retreat from the above theories and appear to argue instead that they seek federal benefits directly from the United States. Indeed, Plaintiffs allege they are entitled to compensation under the LHWCA, the DBA and the WHCA. Plaintiffs' Complaint is nonetheless devoid of any allegations supporting these claims. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Takings cause of action is granted with leave to amend for failure to state a claim.

### 3. Service of process.

Defendants' final argument for dismissal of the claims brought against them in their official capacities is premised on Plaintiffs' alleged technical failures in effecting service. Pursuant to Federal Rule of Civil Procedure 4(m), service of the summons and complaint must be made upon a defendant within 120 days after the filing of the complaint. In the event Plaintiff fails to timely serve process, the court shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time. Fed. R.Civ.P. 4(m). If the plaintiff, however, shows good cause for the failure, the court

shall extend the time for an appropriate period. *Id.*

 Rule 4(m) contains both a mandatory and a discretionary component. If a plaintiff shows good cause for the defective service, the district court must extend the time period for service. *In re Sheehan,* 253 F.3d 507, 512 (9th Cir.2001). "At a minimum, 'good cause' means excusable neglect." *Boudette v. Barnette,* 923 F.2d 754, 756 (9th Cir.1991). With respect to the discretionary component of the rule, the district court has discretion to grant an extension even absent good cause. *Mann v. Am. Airlines,* 324 F.3d 1088, 1090 (9th Cir.2003).

To properly serve Defendants, officers of the United States sued in their official capacity, Plaintiffs must "serve the United States and also send a copy of the summons and of the complaint by registered or certified mail to the ... officer." Fed. R. Civ. Pro. 4(i)(2). To serve the United States, Plaintiff must: A) "deliver a copy of the summons and of the complaint to the United States attorney for the district where the action is brought-or to an assistant United States attorney or clerical employee whom the United States attorney designates in a writing filed with the court clerk"; or B) "send a copy of each by registered or certified mail to the civil-process clerk at the United States attorney's office." Fed.R.Civ.P. 4(i)(1)(A). In addition, Plaintiff must "send a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C." Fed.R.Civ.P. 4(i)(1)(B).

In this case, Defendants argue that, despite having filed their Complaint on March 22, 2010, Plaintiffs did not attempt to serve the United States Attorney for the Eastern District of California[15] or the

---

**15.** Though Defendants concede Plaintiffs at least attempted to serve the United States

Attorney, the Court is unable to locate a record of that service on its docket.

United States Attorney General until the beginning of January 2011, well outside the 120–day period prescribed by Rule 4(m). In addition, Plaintiffs allegedly failed to include a copy of the Summons among the documents actually served on the United States Attorney or the Attorney General and purportedly failed to serve the Attorney General by registered or certified mail. In Opposition, Plaintiffs make only the conclusory assertions that service was proper and that any arguments going to the propriety of service have been waived by Defendants' subsequent appearances before this Court. Defendants' arguments, especially lacking any meaningful opposition by Plaintiffs, are well-taken. However, this Court nonetheless declines to dismiss this case on the basis of improper service. Rather the Court will permit Plaintiffs to serve any amended complaint Plaintiffs elect to file upon Defendants in conformity with Rule 4 not later than ten (10) days after the date Plaintiffs' amended complaint is electronically filed.

### C. Defendants' Motion to Dismiss Plaintiffs' Individual Capacity Causes of Action

#### 1. Personal jurisdiction.

■ According to Defendants, this Court lacks personal jurisdiction over them in their individual capacities. A party may seek dismissal of a claim for lack of personal jurisdiction under Rule 12(b)(2). The burden of establishing personal jurisdiction rests with the plaintiff. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). If the court decides a Rule 12(b)(2) motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of the facts in support of personal jurisdiction. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1168 (9th Cir.2006). In deciding whether a prima facie showing has been made, a court need only consider the pleadings and any submitted affidavits. *Boschetto*, 539 F.3d at 1015. All uncontroverted allegations are taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

■ Where there is no federal statute governing personal jurisdiction, courts apply the long arm statute of the state in which the court sits. *Boschetto*, 539 F.3d at 1015. The applicable California statute allows the exercise of jurisdiction to the full extent permitted by federal constitutional due process. *Id.* As a result, "the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 801. Due process requires that the nonresident defendant have certain "minimum contacts" with the forum, such that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

There are two different forms of personal jurisdiction from a due process perspective, general and specific. *Boschetto*, 539 F.3d at 1016. A court has general jurisdiction over a nonresident defendant when the defendant's contacts with the forum are "substantial" or "continuous and systematic." *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086 (9th Cir.2000). The standard for establishing general jurisdiction is an exacting standard that requires the defendant's contacts to approximate physical presence in the forum state. *Schwarzenegger*, 374 F.3d at 801. Plaintiffs do not allege sufficient facts to warrant, nor do they attempt to justify in their Opposition, a finding of general jurisdiction here.

 The Court's exercise of specific jurisdiction is proper only upon satisfaction of a three-prong test:

(1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its law;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice.

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir.2010) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff has the burden of establishing the first two prongs. *Boschetto*, 539 F.3d at 1016. If the first two prongs are satisfied, the burden shifts to the defendant, who is required to put on a "compelling case" demonstrating that the exercise of jurisdiction would be unreasonable. *Id.*

 Defendants argue Plaintiffs have failed to adequately allege personal jurisdiction is proper in this Court because Plaintiffs have alleged almost no facts pertaining to either named Defendant individually and because the facts alleged are insufficient to show either Defendant purposefully availed herself of jurisdiction here. Plaintiffs allege only that: 1) two of the family members filing the instant action reside in Redding, California; 2) one of the Decedents negotiated his contract with "defendants" while he was in California; 3) Defendant Clinton, and to some extent Defendant Foo, oversee State Department policies; and 4) Defendant Foo worked to impede the families' efforts to find their sons, failed or refused to relay information to Plaintiffs and conducted conference calls in which Plaintiffs were told that the Government had information, but that it could not be released.

First, the instant Plaintiffs' residence is irrelevant to the personal jurisdiction inquiry. In addition, no allegations in the Complaint indicate that the Decedent who allegedly negotiated his Crescent contract in California engaged in those negotiations with either Defendant. Accordingly, these allegations are insufficient to support a personal jurisdiction finding.

Defendants thus primarily argue that "[a]n official's oversight of national or international policies does not give rise to personal jurisdiction in any forum where the effects of those policies are allegedly felt." Motion, 6:11–16 (*citing Hill v. Pugh*, 75 Fed.Appx. 715, 719 (10th Cir. 2003); *McCabe v. Basham*, 450 F.Supp.2d 916, 926–27 (N.D.Iowa 2006); *Wag–Aero, Inc. v. United States*, 837 F.Supp. 1479, 1485 (E.D.Wis.1993); *Vu v. Meese*, 755 F.Supp. 1375, 1378 (E.D.La.1991)). Plaintiffs largely ignore this argument in Opposition and simply reiterate that Defendant Clinton "is violating the constitution through her continuation of the ultra vires and Unconstitutional policies of her predecessor." Opp. to Individual Defendants' Motion, 8:17–18. Defendants here have the better argument, and this Court holds that allegations limited to national policy implementation and oversight are insufficient to support a finding of personal jurisdiction because a contrary finding would essentially subject the individual Defendants to personal liability in every state in the Union regardless of how tenuous their actual contacts with a particular forum might be.

The only contacts attributable to either Defendant that can thus be derived from the Complaint are based on Plaintiffs' allegations that Defendant Foo conducted conference calls with the families of Decedents. Plaintiffs fail, however, to specifi-

cally allege that any of these calls were directed to parties in California. Indeed, while Plaintiffs in their Opposition posit several tenuous theories that may connect Defendant Foo to this forum, those theories are not actually pled in the Complaint. Regardless, even if Plaintiffs had alleged that some of the conference call participants were located in California, jurisdiction in this case would still be improper. *See Applied Underwriters Inc. v. Combined Mgmt., Inc.*, 371 Fed.Appx. 834, 835 (9th Cir.2010); *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir.1991) ("[O]rdinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.' "). Plaintiffs' minimal allegations connecting Defendants to this forum are thus insufficient to establish personal jurisdiction over either individual, and Defendants' Motion to Dismiss Plaintiffs' Complaint for lack of personal jurisdiction is granted with leave to amend.

### 2. Venue.

 Defendants next argue venue is improper in this district. Both Rule 12(b)(3) and 28 U.S.C. § 1406(a) authorize the Court to dismiss an action on grounds that venue is improper. Plaintiffs have the burden of proof to show that venue is proper here. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir.1979); *Hope v. Otis Elevator Co.*, 389 F.Supp.2d 1235, 1243 (E.D.Cal.2005). Unlike a motion to dismiss for failure to state a viable claim under Rule 12(b)(6), on a motion for improper venue under Rule 12(b)(3), "the pleadings need not be accepted as true and the court may consider supplemental written materials and consider facts outside the pleadings" in its adjudication. *Kelly v. Qualitest Pharm., Inc.*, 2006 WL 2536627 at *7 (E.D.Cal.2006) (*citing Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir.2004)). The decision to dismiss for improper venue, or

alternatively to transfer venue to a proper court, is a matter within the sound discretion of the district court. *Cook v. Fox*, 537 F.2d 370, 371 (9th Cir.1976).

Plaintiffs allege venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (2). Section 1391(b) provides, in pertinent part:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

 Plaintiffs do not and cannot allege that both Defendants reside in the Eastern District of California. Venue under Section (b)(1) is therefore improper. In addition, the only allegations Plaintiffs make relevant to this District in support of a Section (b)(2) finding that a "substantial part of the events or omissions" occurred here is that two of the Plaintiffs reside here and that one of the Decedent's contracts with the Crescent "was negotiated and executed in the State of California." Complaint, p. 2, ¶ 1; *id.*, p. 3, ¶ 2. In Opposition, Plaintiffs make little effort to support their choice of venue and state only that "venue is proper because many of the events took place in this judicial district." Opp. to Individual Defendants' Motion, 11:1–2. For the same reasons Plaintiffs' allegations are insufficient to support personal jurisdiction over the individual Defendants, those allegations are insufficient to support venue in this Court as well. Accordingly, Defendants' Motion to Dismiss for improper venue is granted with leave to amend.

### 3. Service of process.

As they did in their Motion to Dismiss Plaintiffs' official-capacity claims, Defendants also argue service was improper as to the individual-capacity Defendants. In this instance, Defendants reiterate their same above arguments, but further emphasize that Plaintiffs have not even attempted to serve Defendants individually. Defendants' arguments are again well-taken, but the Court again declines to dismiss this action on this ground. As already stated, since Plaintiffs' claims are dismissed for alternative reasons, should Plaintiffs elect to file an amended complaint, service on the individual Defendants must be effected in conformity with Rule 4 within ten (10) days of the date their amended complaint is electronically filed.

### 4. Failure to state a claim.

■ According to Defendants, Plaintiffs' Takings cause of action fails against the individual-capacity Defendants for the same reasons it fails against Defendants in their official capacities. Namely, Plaintiffs have only alleged facts indicating that *Crescent*, not the Government, wrongfully withheld funds. Accordingly, Plaintiffs' factual allegations as to the individual Defendants are insufficient on their face.

■ Even if Plaintiffs had stated a Takings claim generally, however, Defendants argue that Plaintiffs failed to properly plead their claims against the individual Plaintiffs as a *Bivens* action. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). According to Defendants, no *Bivens* action can lie for a Takings claim because an alternative, existing process, namely a Tucker Act claim, exists to protect Plain-

tiffs' interests. *See, e.g., Reunion, Inc. v. FAA*, 719 F.Supp.2d 700, 710 (S.D.Miss. 2010); *Anoushiravani v. Fishel*, 2004 WL 1630240 at *8–9 (D.Or.2004). Plaintiffs cite no authority to the contrary nor has this Court found any Ninth Circuit authority resolving this issue. Accordingly, in light of the availability of alternative remedies to protect Plaintiffs' interests, their Takings claim against the individual Defendants must fail.

Though Plaintiffs do not address the merits of Defendants' argument in their Opposition, they contend that "[t]he Complaint may be recast to properly allege claims based on state law tort theories, breach of contract, and Constitutional violations." Opp. to Individual Defendants' Motion, 12:2–4. Plaintiffs' argument ignores the fact that Defendants' 12(b)(6) Motion is directed at the allegations in Plaintiffs' Complaint as currently pled, not as they might be pled on amendment. Given the lack of any substantive allegations going to the individual Defendants' withholding of compensation or benefits from the decedents, and in light of Plaintiffs' lack of meaningful opposition to Defendants' arguments, Defendants' Motion to Dismiss Plaintiffs' claims against them in their individual capacities for failure to state a claim is granted with leave to amend.[16]

### 5. Declaratory and injunctive relief.

Defendants contend that Plaintiffs cannot seek injunctive and declaratory relief from the individual capacity Defendants. Plaintiffs concede this point and, if necessary, will amend their Complaint to clarify that they do not seek such relief from either Defendant individually. Accordingly, Defendants' Motion is granted with

---

**16.** Given the Court's holding that Plaintiffs failed to state a claim against the individual Defendants, this Court need not address the merits of Defendants' qualified immunity defense.

leave to amend as to Plaintiffs' requests for declaratory and injunctive relief.

### D. Plaintiffs' Objections and Request for Judicial Notice

On the date this matter came on for hearing, Plaintiffs filed an Objection and Motion to Strike Defendants' Motions to Dismiss and a Request for Judicial Notice. Neither request adds anything relevant to the parties' papers or the above analysis and thus both requests are denied without prejudice to renewal at some later date.

### CONCLUSION

For the reasons just stated, Plaintiffs' Objection and Motion to Strike (ECF No. 37) and Request for Judicial Notice (ECF No. 38) are DENIED. Defendants' Motions to Dismiss (ECF Nos. 19 and 21) are GRANTED with leave to amend. Not later than forty-five (45) days following the date this Memorandum and Order is electronically filed, Plaintiff may (but is not required to) file an amended complaint. If no amended complaint is filed within said forty-five (45) day period, without further notice to the parties, this action will be dismissed with prejudice.

IT IS SO ORDERED.